IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALBERT MOUSA,

    Petitioner,                      No. CIV S-05-2037 MCE JFM P

    vs.

TOM CAREY, Warden, et al.,

    Respondents.               FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding through counsel[1] with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is serving a sentence of life in prison plus four years following his 1991 Orange County conviction on charges of attempted murder with premeditation and with a firearm.[2] Petitioner challenges the October 18, 2004 decision of the California Board of Prison Terms (Board) to deny him a parole date. Petitioner contends that he suffered a violation of the equal protection clause based on respondents' failure to provide a fair and impartial hearing, and that the continued denial of parole violates his right to due process.

---

    [1] The initial petition was filed by petitioner in propria persona. On January 17, 2006, counsel filed a motion for extension on behalf of petitioner.

    [2] The victim sustained no physical injury.

1

After careful review of the record,[3] this court finds that the petition should be granted.

## FACTS[4]

Traci Nelson was a waitress in a Glendale restaurant in the summer of 1990, and [petitioner] visited her there almost every night. They became friends, but not in a romantic way, although [petitioner] wished differently.

In the fall Nelson became friends with another man, Daniel Raducano, the victim. She told [petitioner] Raducano was her boyfriend in order to cool his ardor. [Petitioner's] reaction was to state, "Don't think that [your][goddamn] boyfriend is going to come between us." Previously [petitioner] told Nelson of a friend in his native country, Iraq, who killed his wife and her lover.

Raducano lived with two roommates in Huntington Beach, and [petitioner] obtained his address and phone number from some notes on napkins in plain sight in Nelson's bedroom. In January 1991, one of them fielded a call for Raducano from a male. The victim was not home, and the caller said to tell him "John" had called. Raducano told his roommate he knew no "John." The man called again twice on the evening of February 4, the second time at about 10:30, but refused to leave a number with the same answering roommate and again left the name John.

About 15 minutes later, Raducano returned to his apartment. He noticed a gray Nissan 280Z backing up as he pulled into his driveway. The victim alit with a bag of groceries in his left hand, and [petitioner] rapidly strode up to him to a distance of only five feet. [Petitioner] asked, "Is your name Dan?" And the victim so acknowledged. [Petitioner] had something in his left hand concealed by a rag or towel and raised it towards Raducano's stomach. The victim thought it might be a gun or a knife and slapped the hand to the side. A gun discharged and apparently clattered to the ground.

Raducano decamped with alacrity as [petitioner] bent to retrieve it, the bag of groceries unceremoniously abandoned. As the victim ran, [petitioner] fired three to four more shots at him, one sounded to the Marine veteran as if it passed quite closely. After hiding

---

[3] The court has also reviewed the documents submitted under seal; they offered nothing of consequence to this case.

[4] The facts are taken from the opinion of the California Court of Appeal for the Fourth Appellate District in People v. Mousa, No. G019509 (August 27, 1997), a copy of which is attached as last document in Administrative Record lodged September 26, 2008.

briefly Raducano peered around a corner and saw the 280Z accelerating away from the scene.

Later the victim noticed fresh and matching holes in his shorts and sweatshirt. He had come very close to being shot in the waist area. The following day Raducano called [petitioner] from the police station, and [petitioner] insisted on calling back from a pay phone. No matter, the victim gave a police phone number. When [petitioner] called, he warned Raducano to stay away from Nelson and said friends of his might have been responsible for the incident. The victim asked if [petitioner] might have shot at him, and he said, "Yes."

Raducano positively identified [petitioner] from a photographic lineup and at trial. He also identified [petitioner's] 280Z. Police investigation at the scene turned up five shell casings and two expended bullets, as well as a freshly cut hole in a chain link fence near the scene of the shooting. The investigating detective was of the view that the new holes in the victim's clothing were indeed bullet holes, as was a criminalist. The handgun used was recovered from [petitioner's] bedroom and a towel with a bullet hole and gunpowder residue was found in his car. A leather jacket with latex gloves in the jacket was also recovered, and the victim said it looked like the one his assailant wore.

[Petitioner's] story to the jury was as follows: He obtained Raducano's phone number and address from the napkin in Nelson's apartment. He tried to reach Raducano several weeks before the incident without success (using his own name) and without receiving a return call. Finally, he did call and leave the name John, perhaps on the day of the shooting. But he decided to visit Raducano to warn him that Nelson was very sensitive and needed to be treated with care and to see if he was "playing games." After noting that the victim's van was not present, he called the roommate again from nearby to ask where Raducano was. The roommate said he did not know.

[Petitioner] drove by the apartment again and was about to leave when Raducano arrived in his van. Nelson told [petitioner] Raducano had a .357 magnum on a camping trip and suspected he might be a drug dealer because he was not employed. Consequently, he approached with his .25 caliber pistol wrapped in a towel in his left hand. If he had wanted to kill the victim, he would have brought his nine-millimeter pistol. He was wearing a different leather jacket from the one containing the gloves.

When [petitioner] approached the victim, he asked if he was Dan and received a positive response. He did not raise his gun at Raducano, but the victim threw his groceries at him and ran. [Petitioner] dropped the pistol, and it discharged. After that [petitioner] returned to his car and fired four shots into the air.

3

> [Petitioner] admitted that he told the victim he might have been involved in the shooting in the returned phone call the next morning. He also admitted lying to the investigating officer after he was arrested, stating he was not in Huntington Beach the night before and had stayed at a friend's house. He said he lied because the officer continued to question him after he asked for an attorney.[5]

(People v. Mousa, slip op. at 5-7)

## ANALYSIS

### I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ

---

[5] The court instructed the jury that the video of [petitioner's] statement could only be considered for impeachment.

4

1 simply because that court concludes in its independent judgment that the relevant state-court
2 decision applied clearly established federal law erroneously or incorrectly. Rather, that
3 application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75
4 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal
5 question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).[6] Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).[7]

II. Petitioner's Claims

   a. Failure to provide fair and impartial hearing

Petitioner alleges that his Fourteenth Amendment right to equal protection was violated at the 2004 parole consideration hearing. Petitioner was born in Baghdad, Iraq. Petitioner contends that at the time he was arrested in 1991,

> the armed forces of petitioner's native Iraq, had invaded Kuwait, and United States forces were poised to attack Iraq, and liberate Kuwait. This created an atmosphere of hatred towards people of Middle-Eastern descent. . . .

/////

---

[6] Such is the case here. The Orange County Superior Court's opinion denying the petitioner's request for habeas relief contained no reasoning beyond the cursory approval of the Board's decision. (See Answer, Ex. D.) The California Supreme Court summarily denied the habeas petition submitted by petitioner. (Id.)

[7] "'[D]ue consideration' of the specified factors requires more than rote recitation of the relevant factors with no reasoning establishing a rational nexus between those factors and the necessary basis for the ultimate decision-the determination of current dangerousness. 'It is well established that a policy of rejecting parole solely upon the basis of the type of offense, without individualized treatment and due consideration, deprives an inmate of due process of law.'" In re Lawrence, 44 Cal.4th at 1210, 82 Cal.Rptr.3d 168, quoting Rosenkrantz, 29 Cal.4th at 684.

> When petitioner first became eligible for parole, he had acted as a role model for other prisoners, and had an exemplary record. Nonetheless, parole was denied in 1999 for no apparent reason. Shortly before petitioner's second Parole Hearing, four airliner's were high-jacked. Two of the[m] crashed into the World Trade Center buildings in New York City, a third crashed into the Pentagon in Washington, D.C., and the fourth was stopped by the passengers, and crashed in Pennsylvania. Once again, petitioner's heritage became an all inclusive reason to deprive him of his freedom.

(Pet. at 2.) Petitioner contends that an equal protection claim can be made by a "class of one" if he has been arbitrarily and irrationally singled out and treated differently from others in similar situations, citing Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).

Respondent did not address this claim, and there is no reasoned state court opinion addressing this claim.

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. The Equal Protection Clause requires the state to govern impartially. McQueary v. Blodgett, 924 F.2d 829, 834 (9th Cir.1991). Laws and rules that apply evenhandedly to all persons within a jurisdiction comply with the fundamental principle of equal protection. See id. (citing Jones v. Helms, 452 U.S. 412, 423, 101 S.Ct. 2434 (1981)). To establish an equal protection violation, a prisoner must show that others similarly situated were treated more favorably and that the disparate treatment was based on an impermissible motive. See United States v. Estrada-Plata, 57 F.3d 757, 760 (9th Cir.1995). Ultimately, the Equal Protection Clause " 'guarantees equal laws, not equal results.' " McQueary, 924 F.2d at 835 (quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 273, 99 S.Ct. 2282 (1979)). A petitioner raising an equal protection claim in the parole context must demonstrate that he was treated differently from similarly situated prisoners and that the Board lacked a rational basis for its decision. See McGinnis v. Royster, 410 U.S. 263, 269-70, 93 S.Ct. 1055 (1973).

/////

1     Petitioner has not shown that similarly situated prisoners have been granted parole
2 dates.  Therefore, petitioner is not entitled to relief on his equal protection claim.
3     b.  Due Process
4     Petitioner's principal claim is that his right to due process was violated by the
5 Board's denial of parole.  (Grounds Two and Three, Pet. at 4-8.)  Petitioner contends he has a
6 liberty interest in parole and that the failure of the Board to set a parole date violates his due
7 process rights.  Petitioner also contends there was insufficient evidence to support the denial of
8 parole.
9     The October 18, 2004 decision challenged herein was made at a subsequent parole
10 consideration hearing.  (See Ex. B to Answer to Petition for Writ of Habeas Corpus, filed January
11 3, 2007; Pet. at 1.)  In its decision, the Board concluded that petitioner was "not yet suitable for
12 parole and would pose an unreasonable risk of danger to society if released from prison."  (Ex. B
13 to Answer, at 73.)  The Board relied on petitioner's commitment offense, which it described as
14 "carried out in a very callous manner, . . . in a calculated manner in that this was a preplanned
15 crime with intent of contacting the victim."  (Id. at 73.)  The Board found that petitioner had
16 "programmed in an extremely limited manner while he's been incarcerated and he has not
17 sufficiently participated in beneficial self-help programs."  (Id. at 74.)  The Board noted Dr.
18 Elaine Mura's psychological report was not totally supportive of release and was also rather
19 contradictory.  (Id.)  Petitioner also did not have employment plans should he be paroled in
20 California.  (Id.)
21     The last reasoned opinion by a California state court was issued by the Orange
22 County Superior Court on February 23, 2005.  (Answer, Ex. D.)  The state court denied the
23 petition for writ of habeas corpus:
24     Here, the BPT concluded Petitioner's crime was carried out in a
    callous, calculated manner because it was planned and intentional
25     and the motive was trivial.  The BPT pointed to facts "beyond the
    minimum elements" of attempted murder by noting Petitioner
26     telephoned the apartment, took a gun with him, covered up the gun,

> waited for the victim, and shot at him several times. But for the victim's agility, he would have been seriously injured if not killed. Moreover, the BPT also noted that Petitioner had completed limited programming, the psychological report was not entirely favorable, and Petitioner lacked firm employment plans in California. The BPT conclusion that Petitioner remains too dangerous for parole is therefore based on relevant grounds and supported by evidence. Its decision therefore "comports with the law." *(In re Dannenberg, supra*, at p. 421.)
>
> The BPT conclusion that Petitioner remains too dangerous for parole was based on relevant grounds and supported by evidence. The BPT decision therefore "comports with the law." *(In re Dannenberg, supra*, at p. 421.) Petitioner fails to show otherwise. The petition for a writ of habeas corpus is DENIED.

In re Albert Mousa, Case No. M-10472 (February 23, 2005)(appended as Ex. D to Answer.)

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts, see Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir.1985), and is unavailable for alleged errors in the interpretation or application of state law, see Lewis v. Jeffers, 497 U.S. 764, 780 (1990). For this reason, petitioner's claims arising out of alleged violations of state law are not cognizable in this federal habeas corpus action.

California's statutory scheme governing parole "creates in every inmate a cognizable liberty interest in parole which is protected by the procedural safeguards of the Due Process Clause." Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003); see also Sass v. California Board of Prison Terms, 461 F.3d 1123, 1127-28 (9th Cir. 2006). "'[T]he Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary."'" Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir. 2008) (quoting Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) (in turn quoting Superintendent v. Hill, 472 U.S. 445, 457 (1985)).

> California law allows the Board to consider a myriad of factors when weighing the decision of granting or denying parole. Parole may be denied if the Board "determines that the gravity of the

8

> current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for [the] individual." Cal.Penal Code § 3041(b).

Biggs, at 915.

> The regulations governing the parole process provide six nonexclusive factors tending to show unsuitability for parole and nine nonexclusive factors tending to show suitability. The factors tending to show unsuitability are: (1) Commitment Offense; (2) Previous Record of Violence; (3) Unstable Social History; (4) Sadistic Sexual Offenses; (5) Psychological Factors; and (6) Institutional Behavior. 15 Cal.Code Regs. § 2402(c). In terms of the first factor, "Commitment Offense," the regulations explain that it tends to show unsuitability when "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." Id. at § 2402(c)(1). The factors indicating suitability for parole are: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for the Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for the Future; and (9) Institutional Behavior. 15 Cal.Code Regs. § 2402(d).

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007).

When reviewing a decision of the Board of Parole Hearings regarding a prisoner's suitability for parole, the relevant inquiry is "whether some evidence supports the decision . . . that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212, 82 Cal.Rptr.3d 169 (2008). The Board has authority to resolve conflicts in the evidence and decide the weight to be given to particular evidence, and has broad discretion that will only be disturbed when due consideration is not given to the specified factors. Id. at 1204, 82 Cal.Rptr.3d 169.

In addition, the Board may rely on the nature of the commitment offense as a basis to deny parole, but only when, considered in light of other facts in the record, the offense continues to be predictive of current dangerousness. Id. at 1221, 82 Cal.Rptr.3d 169; Cal.Code Regs., tit. 15, § 2402; see also Irons, 505 F.3d at 854 ("[I]n some cases, indefinite detention

9

based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."); Biggs, 334 F.3d at 917 ("A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.").

> [T]he Board or the Governor may base a denial-of-parole decision upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, but some evidence will support such reliance only if those facts support the ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety. [Citation.] Accordingly, the relevant inquiry for a reviewing court is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor.

In re Lawrence, 44 Cal.4th at 1221, 82 Cal.Rptr.3d 198. Facts relevant to determining the predictive value of the commitment offense include the amount of time since the offense, the prisoner's history before and after the offense, and the prisoner's current demeanor and mental state. In re Lawrence, 44 Cal.4th at 1211, 1214, 1219, 1221, 82 Cal.Rptr.3d 169.

Petitioner was received in state prison on March 28, 1996,[8] following his September 6, 1991 conviction for attempted murder while armed with a firearm. (Ex. A to Answer.) Petitioner was sentenced to an indeterminate term of life with the possibility of parole, plus four years for the weapons enhancement. (Id.) Petitioner's subsequent parole consideration hearing was held on October 18, 2004, at which time parole was denied for a period of one year.

/////
/////
/////

---

[8] Petitioner was held in County Jail for almost five years after his conviction.

1   (Ex. B to Answer, at 1.)  The Board's October 18, 2004 decision was petitioner's fourth[9] denial
2   of parole.[10]  Petitioner's minimum eligible parole date was July 15, 1999.  (Answer, Ex. B, at 1.)
3   　　　　　As noted above, the Board relied on petitioner's commitment offense to support
4   the denial of parole.  The record reflects that there was some evidence before the Board to
5   support the description of petitioner's commitment offense.  (See Record lodged September 26,
6   2008 (hereafter "record".)  Petitioner premeditated his confrontation with the victim, lay in wait
7   for his victim, and brought and used a handgun during the confrontation.  Although the victim
8   sustained gunshot holes to his clothing, the victim sustained no physical injury.
9   　　　　　Petitioner argues his commitment alone is insufficient to support a finding of
10  present dangerousness required to justify the denial of parole.  Specifically, petitioner contends
11  that he has been virtually disciplinary-free during his incarceration, except for one CDC-115 for
12  refusing to attend class, issued in 1997, and one CDC-128 for delaying a count in 1996, neither
13  of which were for violent conduct.  Petitioner contends he has completed anger management
14  classes, computer technology classes, an apprenticeship program in graphic arts/printing and has
15  attended both A.A. and N.A. classes for three months.  (Pet. at 6.)  Petitioner has also worked in
16  several prison industries and received a diploma from ITT Technical Institute (electronics) and
17  continues independent study in several other fields.  (Id. at 6-7.)
18  　　　　　Petitioner has family ties in Colorado and contends he has the potential resources
19  to set up a small business in that area based on his prior experience as a Jaguar mechanic and
20  repairing communications devices.  (Pet. at 9.)  Petitioner has a strong, positive relationship with
21  his parents in Colorado and his sisters in Iraq.  (Id.)
22  　　　　　Respondent contends, *inter alia*, that there was some evidence to support the
23  denial of parole.

---

[9] The record reflects petitioner had parole hearings in 1998, 2001, 2003, 2004 and 2006. (Record.)

[10] It appears petitioner was also denied parole at the November 2006 hearing. (Record.)

11

1       The 2004 Board decision reflected two areas of concern. First, the change in
2  psychological evaluation from the 1998 report, where there were no diagnostic impressions
3  recorded for Axis I, II or III, to the 2004 report, where petitioner was diagnosed with delusional
4  disorder (erotomania, jealous type) (Axis I), paranoid personality disorder with narcissistic
5  features (Axis II), as well as contradictions within the 2004 psychological report. Second,
6  petitioner had failed to develop insight into why he committed the commitment offense.
7       In the 1998 report of Robert Edward Fire, Psy.D., Consulting Psychologist, Dr.
8  Fire concluded that there were "no specific psychiatric or psychological recommendations at the
9  present time, as inmate does not present with any psychiatric pathology. While he could benefit
10 from insight-oriented psychotherapy, this is not available in this setting." (Record.) Dr. Fire
11 suggested petitioner "program actively and avail himself of any appropriate self-help groups,
12 such as anger management or other therapy as may become available; in an effort to explore how
13 he could have miscalculated so badly as to find himself in his present circumstances." (Id.)
14      Dr. Fire found petitioner presented an average violence risk, based upon the
15 nature of the crime. Petitioner's violence potential was lessened by the lack of history of
16 violence before and after the commitment offense. Dr. Fire noted petitioner's behavior had
17 improved while he was incarcerated and he had maintained a positive attitude, added to his
18 vocational skills and used his knowledge to work when possible. (Id.)
19      By contrast, on June 13, 2003, Elaine L. Mura, Ph.D., Forensic Psychologist,
20 diagnosed petitioner as suffering from delusional disorder and paranoid personality disorder with
21 narcissistic features. (Id.) She opined that petitioner

> did not appear in need of acute psychiatric intervention. However,
> the nature of the crime strongly suggests that he would benefit
> from any form of therapy available. It must be anticipated that he
> would initially be highly resistive to therapy (although he might
> present otherwise); however, in [petitioner's] case, only intensive
> therapy would seem to offer the possibility of personal growth. In
> the absence of the availability of psychotherapy for a general
> population inmate, [petitioner] would benefit from referral to self
> help/educational groups and being encouraged to read self-help

>literature. However, he might also be screened for participation in MHSDS based on his Axis I diagnosis – which would give him access to mental health services.

(Id.)

With respect to petitioner's risk for violence, Dr. Mura evaluated his risk by assessing three different factors: history/background, clinical presentation and management of future risk. (Id.) Petitioner's family moved to the United States when he was 13. His family was forced to live on savings as petitioner's father was unable to find a job, resulting in numerous short-term moves between states. Dr. Mura opined that this instability continued in petitioner's adulthood as he "hopped around" between jobs and the few heterosexual relationships he attempted. Dr. Mura confirmed there was no evidence of abuse, no history of substance abuse, and no prior criminal history other than minor traffic infractions.

Dr. Mura added that in Iraq most marriages are arranged by the principals' families, and that petitioner was not culturally schooled in romantic love. Dr. Mura opined that petitioner's instability and cultural background led him to "mis-read the cues in the platonic heterosexual relationship which led to the controlling offense." (Id.)

Based on history/background, Dr. Mura opined that petitioner presented a low risk for violence. However, Dr. Mura opined that "in the event of (a) a perceived love relationship, possibly unrequited, and/or (b) a burgeoning motivation for revenge (most especially against those whom he blames for his conviction, including Ms. Nelson, the judge, and the criminal justice system more generally), then his risk for violence would rise significantly." (Id.)

With respect to clinical presentation, Dr. Mura stated:

>During the evaluation, [petitioner] evidenced very little insight into his own personality dynamics and appeared more interested in rationalizing, denying, and blaming than in gaining self understanding. However, he did not appear to have 'a criminal mind,' in that he had no real criminal history before the controlling offense. However, it was of some concern that he so easily discounted his collection of weapons as related merely to an interest in mechanical things. [Petitioner] did not present with the classic signs or symptoms of the psychopath – although his high

13

> felt need to defend himself from any perceived attack/confrontation may have resulted in some "psychopath-like" behaviors, including lying, manipulativeness, grandiosity, lack of remorse/guilt, impulsivity, irresponsibility, and inability to accept responsibility for his own actions. He clearly needs to develop the vulnerability required to allow him to look at his own beliefs, behaviors, attitudes, and values. This will probably be difficult to impossible for him to do within the context of a paranoid and narcissistic personality subject to delusional thinking. On the positive side, [petitioner] presented well during the interview and had adjusted well to prison life. In the absence of a perceived love relationship and/or the development of revenge motivation, [petitioner] presented at low risk for violence.

(Id.)

Dr. Mura opined that the development of mature relationships (including heterosexual) in the community will be the principle destabilizer and stressor to petitioner in terms of management of future risk. (Id.) Dr. Mura believed petitioner may have some difficulty dealing with authority figures, for example, a parole agent. Dr. Mura noted petitioner "still obviously has considerable suspicion towards representatives of government agencies, especially those associated with criminal justice." (Id.) "So long as he is not engaged in a perceived love relationship and/or has not developed plans for revenge, he may be capable of parole success." (Id.) Dr. Mura determined that petitioner "was at low risk for future violence. However, he would require monitoring in order to insure that any relationships – especially love relationships – remain healthy and also to insure that he has truly reached the point of 'forgive and forget' regarding his conviction." (Id.)

In her conclusion, Dr. Mura stated that petitioner presented

> with both positive and negative factors for parole. On the positive side, [petitioner] has a current classification score of 20 (10/3/02). He had no real criminal history before the controlling offense. Since incarceration, he received only one 115 violation for a nonviolent offense. He received his GED in County jail and reported that he completed two vocational certificates in prison. He briefly participated in AA/NA in 2000 even though he does not present with a substance abuse problem. He expressed a desire to gain further vocational and self help opportunities in future and - to that end - has requested transfer to CSP-RJD. He maintains

/////

14

contact with his parents and some friends, who will likely provide personal support for him should he parole.

On the other hand, [petitioner] has done very little self exploration since his incarceration. He continues to be highly defensive and to rely on suppression, repression, rationalization, and denial. He also continues to blame others, thereby eluding some of the responsibility for his own actions. Just how much of his personality is culture-bound is difficult to assess. Obviously, some of his defense mechanisms are culturally acceptable and even desirable in Iraq and among Middle Easterners more generally. Some of his defense mechanisms probably also emanate from his traumatic immigration experiences, which left the family stressed, struggling, and economically (and probably personally) depressed. On an overt (but unfortunately superficial) level, he feels that he has done all that he can do to enhance his functioning - and he has. The changes which need to occur are on a deeper level and may be beyond his ability to achieve. Given all the factors noted above, it may be that significant personality changes will not occur regardless of the length of his incarceration.

Overall, risk assessment measures suggested that the inmate poses a <u>low</u> likelihood of becoming involved in a violent offense if released into the free community. This estimate takes into account the inmate's cultural background, language issues (if any), personal, social, and criminal history, institutional programming, community/social support, release plans, maturation, and current clinical presentation. In addition, there is the caveat that such an assessment is at least partially based on the likelihood of abstinence from any substance abuse. It must be emphasized that - in the event of (a) a perceived love relationship, possibly unrequited, and/or (b) a burgeoning motivation for revenge (most especially against those whom he blames for his conviction, including Ms. Nelson, the judge, and the criminal justice system more generally - then his risk for violence would rise significantly.

Based on the above information, [petitioner] would benefit from vocational upgrading. Since he is obviously motivated to complete graphic arts, then it would seem appropriate to transfer him to an institution where he may complete his apprenticeship. Obviously, [petitioner] should remain disciplinary free. From his current presentation, [petitioner] did not appear in need of acute psychiatric intervention. However, the nature of the crime strongly suggests that he would benefit from any form of therapy available. It must be anticipated that he would initially be highly resistive to therapy (although he might present otherwise); however, in [petitioner's] case, only intensive therapy would seem to offer the possibility of personal growth. In the absence of the availability of psychotherapy for a general population inmate, [petitioner] would benefit from referral to self help/educational groups and being encouraged to read self-help literature. However, he might also be

15

1          screened for participation in MHSDS based on his Axis I diagnosis - which would give him access to mental health services.
2  (Id.)

3          Dr. Mura expressed some ambivalence as to petitioner's suitability for parole, but her evaluation of his risk of dangerousness was low for all three controlling factors. She added the caveat that if petitioner were faced with a perceived love relationship, possibly unrequited, and/or a burgeoning motivation for revenge, then his risk for violence would rise significantly. However, she did not state that petitioner had expressed a present desire for revenge.

        Moreover, on November 29, 2006, petitioner was evaluated by P. Davis, Psy.D., Clinical and Forensic Psychologist, in preparation for the 2006 Board hearing. Dr. Davis appeared to agree with Dr. Fire's evaluation of petitioner and noted no diagnosis for Axis I or Axis II. (Id.) Dr. Davis found petitioner had no juvenile or other criminal history prior to the commitment offense, and no disciplinaries for violence or for substance abuse. Petitioner had completed anger management in 2001 and a self-help class in 2004 and continued to remain disciplinary free. He had a place to live and a job offer, and the support of family and friends to help him adjust to life after parole. Petitioner gets along well with inmates and staff.

        Dr. Davis found petitioner had programmed well, in a nonviolent and nondangerous way, and showed a low risk of dangerousness and violence when compared to other life-term inmates, whether the inmates were within the CDCR or paroled. (Id.)

        The Life Prisoner Evaluation for the November 2006 Board hearing reflects that petitioner was held at Folsom State Prison with Medium A custody through March 18, 2005. Petitioner was transferred to California State Prison-Solano as a non-adverse transfer on March 18, 2005 due to Folsom converting from Level II to Level III. Petitioner worked in the kitchen as a welder and as a porter, and received average to exceptional work reports. (Id.) Petitioner participated in Stress and Anger Management as well as Network for life programs during this

/////
/////

review. Petitioner has training and/or prior employment as a Welder Mechanic and Electronics Technician, and has completed the graphics arts and printing programs.[11]

Petitioner is now 42 years old. He has been incarcerated for eighteen years, without sustaining a single prison disciplinary for violence or substance abuse. His last nonviolent prison disciplinary was received in 1997. All three psychological reports reflect petitioner presents a low risk of dangerousness and violence. The record reflects that petitioner regrets the commitment offense, which is the only crime petitioner has ever committed. Petitioner has now completed two programs on anger management (2004 and February 2006) and a program on stress management (December 2005). He completed his GED while in the County Jail, has a wealth of work experience and has received average to exceptional work reports.

The record does not support the Board's finding that petitioner must avail himself of more self-help programs for a longer period of time. The Board failed to identify specific programs the Board believed would be of benefit to petitioner. Petitioner did not commit the underlying crime while under the influence of drugs or alcohol, and his attendance at A.A. or N.A. appear to offer no benefit. However, petitioner did attend these programs for three months in 2000. Petitioner has attended stress and anger management classes and now has also participated in a Network for life program. Although at least two psychologists have suggested petitioner would benefit from psychotherapy to gain insight into the commitment offense, it is undisputed that psychotherapy is not available to the general population. Petitioner cannot be required to attend programs that do not exist.

/////

---

[11] The court has also reviewed previous decisions denying petitioner parole. The 1998 decision relied principally on petitioner's commitment offense, but also on the perception that petitioner had not participated in sufficient beneficial self-help programs. The 2001 decision relied on the commitment offense and noted petitioner needed additional time to face, discuss, understand and cope with stress in a non-destructive manner. The 2001 Board also found petitioner failed to complete necessary programming, hadn't completed a vocation, and failed to adequately participate in self-help programs.

Petitioner has numerous job skills upon which he can draw employment opportunities on parole. Prior to incarceration he worked as a Jaguar mechanic and electronics repair person. During incarceration he has completed the graphics arts and printing programs and has worked on the Maintenance Welding Crew.

The United States Court of Appeals for the Ninth Circuit has held that after an inmate has "served the minimum number of years required by his sentence," Irons, 505 F.3d at 853, extended reliance solely "an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs at 917. Petitioner's minimum eligible parole date was July 15, 1999. (Ex. B to Answer, at 1.) This year, petitioner will have served ten years beyond his minimum eligible parole date.

Eighteen years have passed since the commitment offense, the only crime petitioner has committed. He has sustained no violent prison disciplinaries during those eighteen years. His last nonviolent disciplinary was in 1997. Three psychologists confirm that petitioner presents a low risk of violence and has no psychiatric pathology. Petitioner's current demeanor and mental state have presented no disciplinary problems during his incarceration and he has received average to exceptional work reports. This record demonstrates petitioner's commitment offense has lost its predictive value, and petitioner no longer poses a present danger to the community. In re Lawrence, 44 Cal.4th at 1211, 1214, 1219, 1221, 82 Cal.Rptr.3d 169.

In light of the above, the denial of parole to petitioner in 2004 was not supported by even the minimal quantum of evidence required to satisfy the requirements of the federal due process clause. Moreover, the Board's 2006 decision to again deny petitioner parole makes manifest and inescapable the conclusion that no purpose will be served in remanding this matter for another parole consideration hearing. The record does not reflect that the commitment offense, committed some 18 years ago, demonstrates petitioner poses a present danger to society

/////

1  if paroled.  It is therefore the recommendation of this court that the Board of Prison Terms be
2  directed forthwith to set a parole date for petitioner.
3         In accordance with the above , IT IS HEREBY RECOMMENDED that
4  petitioner's application for a writ of habeas corpus be granted and the Board of Prison Terms be
5  directed to forthwith set a parole date for petitioner.
6         These findings and recommendations are submitted to the United States District
7  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days
8  after being served with these findings and recommendations, any party may file written
9  objections with the court and serve a copy on all parties.  Such a document should be captioned
10 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that
11 failure to file objections within the specified time may waive the right to appeal the District
12 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
13 DATED: February 19, 2009.

_____
UNITED STATES MAGISTRATE JUDGE

001; mous2037.157